NEWPORT COMPANY and another, Appellants, vs. TAX COMMISSION, Respondent.

*June 3—November 5, 1935.*

294

For the appellants there was a brief by *Fawsett & Shea* of Milwaukee, and oral argument by *Edmund B. Shea.*

For the respondent there was a brief by the *Attorney General* and *Herbert H. Naujoks*, assistant attorney general, and oral argument by *Mr. Naujoks.*

The following opinion was filed June 24, 1935:

WICKHEM, J.    The taxpayer is a Delaware corporation, organized July 14, 1919, and licensed to do business in Wisconsin on August 25th of that year.   The company engages in the manufacture of dyestuffs and chemicals, with factories at Carrollville, Wisconsin, and Passaic, New Jersey, and also the manufacture of wood distillates, which is carried on in the states of Florida, Alabama, and Louisiana.   Prior to 1928, the entire income from the business of the taxpayer

was reported on the apportionment basis, and from the totals so reported a portion was allotted to and taxed by the state of Wisconsin as income arising in this state. For the year 1928, and the following years, a separate accounting system was set up for the wood distillate division, and for the purposes of apportionment only the Wisconsin and New Jersey operations were considered. An examination of the books and records of the taxpayer for the years 1926 to 1929, inclusive, resulted in an additional assessment, of which the taxpayer was notified, amounting to $147,960.10. Upon a hearing before the Tax Commission the determination of the auditor was affirmed on December 29, 1933. On December 28, 1933, the taxpayer filed a claim for refund in respect to its income for the years 1927 to 1929, inclusive, based upon alleged capital losses for these years. The validity of this claim was not determined by the Tax Commission, and was expressly reserved in its memorandum constituting a supplementary opinion published on July 2, 1934. At the outset there is a procedural question.

It is contended that the Tax Commission exceeded its lawful powers in determining the taxpayer's income for the years 1927, 1928, and 1929, and in assessing additional taxes thereon prior to a proper determination of the taxpayer's pending claim for refund for taxes overpaid on income for these years.

It is the taxpayer's contention that since the additional assessments were the result of a field audit, and since under sec. 71.17 (3), Stats. 1927, no refund shall be made for any year, the income of which was assessed as the result of a field audit, the commission had no power to foreclose the taxpayer of a hearing upon his claim for refund by making an additional assessment while such demand was pending. Sec. 71.12, Stats. 1927, reads:

"No additional assessment by office audit or field investigation shall be placed upon the assessment roll without no-

tice in writing to the taxpayer giving him an opportunity to be heard in relation thereto. Such notice shall be served as a circuit court summons or by registered mail. Any person feeling aggrieved by such assessment shall be entitled to a hearing before the tax commission in the case of corporations or the county board of review in the case of persons other than corporations, if within twenty days after receiving notice of such proposed assessment he shall apply for such hearing in writing, explaining in detail his objections to such assessment. If no request for such hearing is so made, such assessment shall be final and conclusive. If a request for hearing is made the taxpayer shall be heard by the tax commission or the board of review as the case may be and after such hearing the tax commission or the board of review shall render its decision regarding such assessment." .

Sub. (3), sec. 71.17, Stats. 1927, provides:

"No refund shall be made and no credit shall be allowed on any item of income or deduction, assessed as a result of an office audit, the assessment of which shall have become final and conclusive under the provisions of sections 71.12, 71.13, 71.14, 71.15 or 71.16; and no refund shall be made and no credit shall be allowed for any year, the income of which was assessed as a result of a field audit, and which assessment has become final and conclusive under the provisions of sections 71.12, 71.13, 71.14, 71.15 or 71.16."

It will be noted that the finality of assessments made as the result of an office audit has to do with particular items of income or deductions, whereas with reference to assessments made in consequence of a field audit, the finality attaches to the entire assessment for the year. The purpose of these provisions is clear. If, after due notice, additional assessments are made, the taxpayer should not be permitted to keep open indefinitely questions as to its income and liability for taxation by persistent applications for refunds. It was the intention of the statute to foreclose the applications for refund to the same extent that the office or field audit had

arrived at final determinations with respect to the taxpayer's income. Since an office audit is the result of an examination of the returns by the taxpayer, and for its purposes accepts the truth of the return, an additional assessment based upon the disallowance of a deduction, or upon a ruling on any other item of the return of the taxpayer, is treated as precluding a refund or credit only on the items so dealt with in the audit. The field audit, however, contemplates a verification of the facts as reported in the return of the taxpayer, and a complete review of the taxpayer's books for the purpose of establishing accurately and finally the facts with respect to its income. The field audit was therefore intended to foreclose any further inquiry into the facts relative to the taxpayer's income for the year or years under audit. This being true, every item or fact bearing either upon the propriety of an additional assessment or of a refund is material and should be examined in the course of a hearing. The taxpayer may take issue directly with the assertion of the taxing authorities that portions of its income were not reported, not fully reported, or not properly reported, and that therefore an additional assessment should be levied. If the taxpayer is unable to meet these issues successfully, it may establish, if it can do so, that it has overreported its income, and this should be taken into account as bearing upon the propriety or amount of an additional assessment. This procedure is contemplated by sec. 71.12, which requires as a condition to a hearing, not merely that a demand for such hearing be made within a specified time, but that objections to the assessment be set forth in detail. When a hearing is had upon an assessment proposed as the result of a field audit, the taxpayer must establish its right to a refund as defensive matter tending to show that no additional tax should be assessed, or that the additional tax claimed to be due by reason of new discoveries upon the audit should be

reduced by the amount claimed as a refund. The statute makes no specific regulation of the procedure in this respect, but this is necessarily the conclusion when the nature of the field audit is considered. In this case the taxpayer did not make the facts, upon which a claim for refund depends, a ground for objecting to the additional assessment, nor were these facts put forward on the hearing as defensive matter bearing upon the propriety or amount of the additional assessment. The taxpayer took the position that the refund involved wholly separate procedure, and that a separate application for a refund should follow the hearing upon the additional assessment. To sustain the taxpayer's contention would permit the taxpayer to introduce intolerable delays into the process of ascertaining its proper tax. The hearing having proceeded without a consideration of the matters relating to a refund, the jurisdiction of the Tax Commission to come to a decision upon the basis of the audit, objections, and hearing, is not affected by an application for a refund. When, on December 29, 1933, the commission made a determination and additional assessment, the taxpayer's right to a refund terminated under the provisions of sec. 71.12. So, likewise, did the jurisdiction of the commission to consider the claims for refund as applied to any of the years for which an additional assessment was made. As we read the record, no additional assessment was made for 1929, as the result of the field audit, and what has heretofore been said has no application to taxpayer's claim in so far as it relates to that year.

The taxpayer's first contention upon the merits is that a gain realized by it from the sale of certain shares of stock of the Milwaukee Coke & Gas Company, in the year 1927, is not subject to a Wisconsin tax. Between August, 1919, and September, 1923, the taxpayer acquired 19,152½ shares of stock of the Milwaukee Coke & Gas Company, a Wisconsin

corporation. From 1919 to 1922, certificates representing the stock then owned by the taxpayer were held by a trust company in Cleveland as collateral security for bonds issued by the taxpayer. Thereafter, until May 16, 1927, all of the shares, except 1,637½ shares, remained with the trust company. The shares excepted represented a later purchase and were kept in a safety-deposit box in Chicago. On May 16, 1927, the taxpayer sold this stock and realized a profit of $2,274,589.16. The sale was authorized by resolution of the directors at a meeting held in New York city. At that time the taxpayer had no office or place of business in the state of New York, and was not licensed to do business there. Its regular directors' meetings were all held in Wisconsin. The instrument of sale was executed by the taxpayer in. New York, and by the purchaser in Pittsburg. Manual delivery of the stock and purchase money was at Cleveland, Ohio, except as to the shares held in Chicago, which were delivered and paid for at Pittsburg. The entire income resulting from this profit is sought to be taxed, and the first contention of the taxpayer upon the merits relates to the propriety of this tax.

A consideration of the questions involved resolves itself naturally into two principal inquiries: (1) Was the tax levied in accordance with the provisions of the Wisconsin statutes applicable to the situation; and (2) if the statutes are so construed as to authorize the tax, are they subject to fatal objections upon constitutional grounds? The statute principally involved is sec. 71.02, Stats. 1927. Sec. 71.02 (3) (c) provides in substance that for the purpose of taxation, income from mercantile or manufacturing business, not requiring apportionment under sec. 71.02 (3) (d), shall follow the situs of the business from which derived. Income from tangible property, real or personal, follows the situs of the property from which derived. Income from intangibles,

including profits from the sale of stocks, bonds, and securities, shall follow the residence of the recipient. Sec. 71.02 (3) (d), Stats. 1927, provides that persons engaged in business within and without the state shall be taxed only on such income as is derived from business transacted and property located within the state. This section sets up a system of apportionment whereby the proportion of income derived from such business, assignable to Wisconsin, may be ascertained.

Sec. 71.02 (3) (e), Stats. 1927, provides:

"A foreign corporation whose principal business is carried on or transacted in Wisconsin shall be deemed a resident of this state for income tax purposes, and its income shall be determined and assessed as if it were incorporated under the laws of Wisconsin, notwithstanding its domicile is elsewhere."

Since it is not seriously contended in this case that the income derived from the sale of this stock represents apportionable income from the operation of the taxpayer's business, it is apparent that it is described by sec. 71.02 (3) (c) as an intangible, the income of which shall follow the residence of the recipient. It is in fact expressly described in that section under this classification, "income derived from . . . stocks . . . or from the sale of similar intangible personal property, shall follow the residence of the recipient." Since sec. 71.02 (3) (e) provides that a foreign corporation whose principal business is carried on or transacted in Wisconsin shall be deemed a resident of this state for income tax purposes, it is plain to us that it was the legislative intent to subject this profit to an income tax, provided, of course, the principal business of this taxpayer was actually in Wisconsin. This fact is strenuously contested but its determination is unnecessary here. It will be assumed that the principal business of the taxpayer was conducted in Wisconsin.

Our conclusion that it was the intention of the statutes to tax this item providing the taxpayer's principal place of business was Wisconsin follows whether sub. (3) be treated as actually effecting a change in the residence of a foreign corporation transacting its principal business here, or so modifying the statutory definition of residence as to include such corporation. The intention to tax is plain, and must be given effect unless the statute so construed contravenes some provision of the constitution.

The taxpayer's objections on constitutional grounds may briefly be stated as follows: That no state may exceed its taxing jurisdiction without violating the rights of the taxpayer under the Fourteenth amendment; that the jurisdiction of a state to tax depends upon the presence of the subject of the tax within the territorial limits of the taxing power. *City of St. Louis v. Wiggins Ferry Co.* 11 Wall. (78 U. S.) 423, 20 L. Ed. 192; *State Tax on Foreign-Held Bonds,* 15 Wall. 300, 21 L. Ed. 179; *Union Refrigerator Transit Co. v. Kentucky,* 199 U. S. 194, 26 Sup. Ct. 36, 50 L. Ed. 150; that while as to individuals domiciled within the state the fact of domicile confers jurisdiction to impose a tax upon income derived by such persons from sources outside as well as within the taxing state, its power to levy a tax upon nonresidents is limited to taxing income derived from property or business located within the state. In connection with this contention it is claimed that the legislature may not, by legislative fiat, increase or enlarge its jurisdiction to tax by a statute arbitrarily defining as residents those who in fact are not. This requires some consideration of the principles heretofore laid down by the United States supreme court, since this court is bound by the principles announced by that court. With respect to tangible property, it is well settled that the state may not impose a tax upon real or personal property located beyond the boundaries of

the state. *Frick v. Pennsylvania,* 268 U. S. 473, 45 Sup. Ct. 603; *Union Refrigerator Transit Co. v. Kentucky,* 199 U. S. 194, 26 Sup. Ct. 36. With respect to intangibles, the supreme court, in *Blackstone v. Miller,* 188 U. S. 189, 23 Sup. Ct. 277; *Frick v. Pennsylvania, supra; Cream of Wheat Co. v. Grand Forks County,* 253 U. S. 325, 40 Sup. Ct. 558; and other decisions, had intimated that intangible property, unlike tangible property, might have more than one situs for taxation. By a series of decisions, beginning with *Farmers' Loan & Trust Co. v. Minnesota,* 280 U. S. 204, 50 Sup. Ct. 98; *Beidler v. South Carolina Tax Comm.* 282 U. S. 1, 51 Sup. Ct. 54; *Baldwin v. Missouri,* 281 U. S. 586, 50 Sup. Ct. 436; *First National Bank v. Maine,* 284 U. S. 312, 52 Sup. Ct. 174; the *Blackstone Case* and the cases following it were expressly repudiated. In the *Farmers Loan Co. Case,* it was held that "while debts have no actual territorial situs, . . . a state may properly apply the rule *mobilia sequuntur personam* and treat them as localized at the creditor's domicile for taxation purposes," and that they are "entitled to enjoy an immunity against taxation at more than one place similar to that accorded to tangibles." In *First National Bank v. Maine, supra,* a resident of Massachusetts died there owning shares in a Maine corporation, most of the property of which was in Maine. A Massachusetts tax was assessed and paid on legacies and distributive shares principally made up of the proceeds of this stock. A like tax was assessed in Maine, from which the amount of the Massachusetts tax was deducted. It was held that the Maine tax was invalid under the due process clause. The court applied the rule of the *Farmers Loan Co. Case* to shares of stock. While the *Farmers Loan Co., Beidler,* and *Baldwin Cases* all dealt with bonds, notes, and credits, the court pointed out that the rule of immunity from taxation in more than one state was broader than the application thus far made of it. The rule

was extended to corporate stocks, and the decision is broad enough to extend the rule to all intangibles. The court does not preclude multiple taxation because there might be a death duty in the state of the domicile upon corporate stock passing by inheritance and a stock transfer tax in the state where the corporation had its domicile. These different forms of taxation would not fall within the rule of the cases discussed because of the difference in character of the taxes levied, but it is clear enough that both states could not impose death duties, and this upon jurisdictional grounds. See 48 Harvard Law Review, 407.

With respect to income taxes, it was held in *Shaffer v. Carter*, 252 U. S. 37, 40 Sup. Ct. 221, that a state may tax a nonresident on income derived from property or business located within the state. While it is not so held, it appears to be implied that that is the limit of its jurisdiction with respect to income taxes. In *Lawrence v. State Tax Comm.* 286 U. S. 276, 52 Sup. Ct. 556, it was held that the state may levy an income tax upon its own citizens regardless of the source of the income. It has been held in Wisconsin, *State ex rel. Manitowoc Gas Co. v. Wis. Tax Comm.* 161 Wis. 111, 152 N. W. 848, that if an income be taxed, the recipient thereof must have a domicile within the state or the property or business out of which the income issues must be situated within the state so that the income may be said to have a situs therein; while in *Bayfield County v. Pishon*, 162 Wis. 466, 156 N. W. 463, it was held that the Wisconsin income tax law has for its purpose a tax only upon such part of a nonresident's income as is derived from sources within the state or within its territorial jurisdiction. In *Hans Rees' Sons, Inc., v. North Carolina*, 283 U. S. 123, 51 Sup. Ct. 385, it was held that the state may adopt a method of apportioning income in the case of a business conducted by a foreign corporation both within and without the state, and that

such method will be sustained if it is not intrinsically arbitrary, and that evidence is receivable bearing upon the issue as to the fairness of the means of apportionment. The validity of the apportionment could hardly be material if the jurisdiction of the state to tax income extended to that derived from business or property without the state.

It thus appears to be the rule, established by the United States supreme court, and heretofore recognized by this court, that as to nonresidents there may be no imposition of income taxes upon income derived from property or business located without the state; that the situs of such intangibles as corporate stock is the domicile of the owner; that since property of this character, owned by a foreign corporation, is not located within the state of Wisconsin, it is not subject to an income tax levied by this state. So far as the cases leave the subject, the state of Delaware may tax this taxpayer upon its entire income. Wisconsin may tax it upon income derived from property located within the state. To this extent multiple taxation is permitted, but this represents the limits so far established. It remains to be considered whether this conclusion is affected by one or both of two circumstances claimed to be present here. The first is that there is an exception to the rule stated, in cases where intangibles owned by a nonresident have, as stated by the California court in *Westinghouse Electric & Mfg. Co. v. Los Angeles County*, 188 Cal. 491, 205 Pac. 1076, "been localized in some independent business or investment away from the owner's domicile, so that its substantial use and value primarily attach to and become an asset of the outside business. In other words, while a nonresident may own the business, the business controls and utilizes in its own operation and maintenance the credits and income thereof." The most typical case for the application of this doctrine is where a person carries on a continuous money-lending business in

a jurisdiction apart from his domicile, and in such a situation the intangible property which is used in the business is said to have a business situs where the business is carried on. *Metropolitan Life Ins. Co. v. New Orleans,* 205 U. S. 395, 27 Sup. Ct. 499; *New Orleans v. Stempel,* 175 U. S. 309, 20 Sup. Ct. 110; *Bristol v. Washington County,* 177 U. S. 133, 20 Sup. Ct. 585. See also 48 Harvard Law Review, 407.

May this doctrine be applied to the situation here presented and warrant the conclusion that the stock purchased by the company for investment or capital purposes, held outside the state and pledged generally as collateral for bonds to promote the entire company and all of its activities, was localized in the state of Wisconsin? It was stated in the *Beidler Case* that a conclusion that debts acquired a business situs must have evidence to support it. We discover no evidence to support such a conclusion. This company, domiciled in Delaware, with plants in several states, made the investment and used the profits for the general purposes of the company, and we fail to see how this income, or the stock itself, can be said to have acquired a business situs in Wisconsin, any more than in any other place where its business activities were carried on.

The state's next contention is that the state of Wisconsin, if the taxpayer's principal business is located here, may, by legislative fiat, domesticate the corporation for purposes of taxation, and by this process give to its intangible property a local status. Reliance is had upon 2 Cooley, Taxation, §§ 911, 914; *Ricker v. American Loan & Trust Co.* 140 Mass. 346, 5 N. E. 284; *Metropolitan Life Ins. Co. of New York v. Board of Assessors,* 115 La. 698, 39 So. 846; *Hubbard v. Brush,* 61 Ohio St. 252, 55 N. E. 829. It seems evident to us that a state may not, by definition, construction, or other process, domesticate a person or corporation in

fact domiciled elsewhere, in order to avoid the application of constitutional principles established by the supreme court of the United States relative to jurisdiction for purposes of taxation. To say that it may do so is to contend that the limits of the state's jurisdiction to tax are wholly self-imposed. But it is claimed that, conceding this, a state, as a condition to admitting foreign corporations to do business within the state, may require that the corporation so admitted be taxed upon the same basis as domestic corporations. There are two answers to this: First, sec. 71.02 (3) (e) was not enacted as a condition to the consent of the state that foreign corporations transact business in Wisconsin; nor was it in existence when this taxpayer was so licensed; second, assuming that it does constitute a condition, its effect is to attach an unconstitutional condition to the consent that the foreign corporation transact business within the state. The earlier cases in the United States supreme court held that a state may impose a tax upon the exercise by a corporation, chartered elsewhere, of its corporate privilege within the state, and that the amount or character of the tax is wholly within the discretion of the state. *Home Insurance Co. v. New York,* 134 U. S. 594, 10 Sup. Ct. 593; *Delaware Railroad Tax,* 18 Wall. 206, 21 L. Ed. 888; *Horn Silver Mining Co. v. New York,* 143 U. S. 305, 12 Sup. Ct. 403; *Maine v. Grand Trunk Ry. Co.* 142 U. S. 217, 12 Sup. Ct. 121; 1 Beale, Conflict of Laws, pp. 627 to 629. However, this view did not survive. In *Western Union Tel. Co. v. Kansas,* 216 U. S. 1, 30 Sup. Ct. 190, it was held that a Kansas statute, which made it a condition of foreign corporations entering the state that they should pay a tax or fee consisting of a percentage of their total authorized capital, was invalid as an unlawful interference with interstate commerce, and as an attempt to tax property outside the state. This decision was followed by a series of cases, notably

*Pullman Co. v. Kansas,* 216 U. S. 56, 30 Sup. Ct. 232; *Atchison, T. & S. F. Ry. Co. v. O'Connor,* 223 U..S. 280, 32 Sup. Ct. 216; *Looney v. Crane Co.* 245 U. S. 178, 38 Sup. Ct. 85; see 1 Beale, Conflict of Laws, pp. 629 to 634. See also "Indirect Encroachment on Federal Authority," T. R. Powell, 31 Harvard Law Review, 321, 572, 721, 932. Professor Beale states:

"Where a state imposes a tax upon a foreign corporation for the privilege of doing local business based upon its entire capital stock which represents in part property permanently outside the taxing state, the tax, though in form an excise, is in effect a tax upon the property. The imposition of such a tax is an attempt to tax property beyond the state's control and is invalid. . . . In each one of the cases cited, the corporation was engaged in interstate commerce. But the vice of taxing extra-territorial values, one of the grounds for the decisions here discussed, is equally open to condemnation whether the corporation is doing interstate and local or a purely local business."

While the cases and discussion were not addressed to a situation identical with that presented here, they establish principles that are clearly applicable. Assuming that sec. 71.02 (3) (e), domesticating foreign corporations having their principal business in Wisconsin for the purpose of taxation, constitutes a tax imposed as a condition to the transaction of business in the state, or as a fee for that privilege, it is invalid under the decisions as an attempt to reach property of a foreign corporation which is beyond the taxing jurisdiction of the state. The cases cited by the state all antedate the *Western Union Tel. Co.* Case, and presumably do not survive the rule of that case. While there is much to be said for the contention that the state has unlimited power to exact these conditions, this contention has been repudiated by the United States supreme court, and we are bound by the determinations of that court. We also see some merit to the con-

tention of the state that since taxes are thought to have some relation to the protection furnished to the taxpayer, there are more substantial grounds for giving to the state, where the principal business is conducted, jurisdiction to tax all its income, rather than the state of its domicile, to which, in many cases, its only real relation is that it has filed articles of incorporation there. Since this is not a matter of first impression, or even a matter for us to determine, except as we follow the rule of the United States supreme court, further discussion would not be profitable.

The next contention of the taxpayer is that the profit realized by the sale of patent rights during the year 1928 is not subject to the Wisconsin income tax. The facts with respect to this contention are as follows: In connection with its manufacturing plant in Wisconsin, the taxpayer maintained a research laboratory for the purpose of discovering and perfecting processes, formulæ, and methods applicable to its various lines of manufacture. As a by-product of this research, chemists at this laboratory discovered and developed a formula entitled, "A process of preventing the dissolution of iron and steel in sulphuric acid and pickling baths." Letters patent were issued to the taxpayer covering this formula. During the years 1927 and 1928, sales of American, Canadian, and European rights to this patent were made to the American Chemical Paint Company, and a net profit realized amounting to $127,052.78. The taxpayer contends that these come under the description of sec. 71.02 (3) (c), which provides that income derived from patent royalties or from the sale of similar intangible property shall follow the residence of the recipient. It is the contention of the state that since the discovery was the result of ordinary activities of the taxpayer, associated with and indispensable to its manufacturing operations in this state, it falls within the exception to the

general rule, for the reason that it has a business situs in Wisconsin. Except for this claim, the contention here is fully governed by what has been said concerning the profit realized from the sale of stock. If this patent did not have a business situs in Wisconsin by reason of the circumstances of its discovery and development, then its business situs, by the terms of the statute, and by rules of law heretofore discussed, was at the residence of the recipient of the income from its sale, and from that point on the matter is governed by the same considerations that are applicable to profits from the sale of stock. The question is a troublesome one. The operation of the research laboratories certainly is closely identified with the manufacturing operations, in the sense that it has for its purpose the perfecting of the final product. While profits from the sale of discoveries made in that laboratory would seem to be somewhat outside the scope of the manufacturing business engaged in, it may reasonably be contended that the incidental discovery of a product or process having no relation to the products usually manufactured, or perhaps no use except in some other trade, might be considered to be one of the normal by-products of its activities. If the incidental discovery in this case resulted in the manufacture of some new product, wholly dissociated from those customarily produced by this company, it might reasonably be held that income from this source was earned by ordinary business operations within the state. The difficulty is created by the fact that the discovery in this case culminated in the issuance of letters patent,—in the creation of intangible property the income from which is by statute given a situs at the residence of the owner or recipient, and which is said by the United States supreme court to have a situs at the domicile of the owner. May this patent be treated, by reason of the place and circumstances of its discovery, as having a situs in

Wisconsin? We think not. The taxpayer was not engaged in Wisconsin in the business of dealing in letters patent. The intangible known as a patent had no more existence in Wisconsin than any other intangible has existence at the location of the tangible property to which it evidences rights. We see no way in which the business situs doctrine can be applied to the letters patent.

The next contention of the taxpayer is that certain insurance moneys received by the taxpayer for the year 1926, as indemnity under insurance policies covering against loss of use and occupancy of manufacturing plants by reason of fire, explosion, and hurricane, were erroneously included in the computation of the taxpayer's apportionable income. All these items of insurance were for loss of use and occupancy. The insurers thereby reimbursed the taxpayer in each case for loss of net profit which presumably would have been realized by the operation of the plant during the period of interruption by reason of the casualty insured against, and for the amount of fixed charges and expenses incurred by the taxpayer during such suspension of operations. It seems to us that this is clearly business income. The amounts received correspond as nearly as possible to the profits which the taxpayer would have realized, and the state is entitled to regard these as substitutes for the profit which, had there been no interruption of business, would have represented apportionable income. This is especially true since the expenditures for premiums were paid out of operating income and treated as an ordinary expense of the business.

The same comment applies to certain policies of fire insurance paid as indemnity for the destruction of certain salable goods of the taxpayer. It is the state's position that profit made by reason of a fire insurance policy is entitled to be treated on the same basis as though the goods were sold and the same profit realized. We consider this contention to be

sound for reasons heretofore stated with reference to the proceeds, use, and occupation policies.

In view of the court's conclusions, it is unnecessary to consider whether the conclusion of the commission that the taxpayer's principal place of business is in Wisconsin is correct.

*By the Court.*—The judgment of the circuit court is reversed, and the cause remanded with directions to enter judgment setting aside the reassessment and remanding the record to the Tax Commission for further proceedings.

A motion for a rehearing was denied, without costs, on November 5, 1935.